Slip Op. 14 - 59

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, Plaintiff, v. UNITED STATES, Defendant, and MINH PHU SEAFOOD CORP., et al., Defendant-Intervenors. | Before: Donald C. Pogue, Chief Judge Court No. 12-00314[1] |

OPINION

[affirming final results of administrative review of antidumping duty order]

Dated: May 29, 2014

Andrew W. Kentz, Jordan C. Kahn, and Nathaniel Maandig Rickard, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Mykhaylo Gryzlov, Senior

---

[1] This action was previously consolidated with Nha Trang Seaproduct Co. v. United States, Ct. No. 12-00317, and Minh Phu Seafood Corp. v. United States, Ct. No. 12-00310, see Order Nov. 26, 2012, ECF No. 23, but the latter two actions were subsequently dismissed, see ECF No. 28.

Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Matthew R. Nicely</u> and <u>Alexandra B. Hess</u>, Hughes Hubbard & Reed LLP, of Washington, DC, for the Defendant-Intervenors.


**Pogue, Chief Judge:** This action arises from the sixth administrative review of the antidumping duty order covering certain frozen warmwater shrimp (the "subject merchandise") from the Socialist Republic of Vietnam ("Vietnam").[2] Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC")[3] challenges the final results of this review, claiming that the United States Department of Commerce ("Commerce") made unreasonable determinations when calculating the home market or "normal" comparison values that the agency used to determine whether and to what extent the subject merchandise was dumped in the U.S. market during the relevant time period.[4] Specifically, AHSTAC

---

[2] See <u>Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam</u>, 77 Fed. Reg. 55,800 (Dep't Commerce Sept. 11, 2012) (final results and final partial rescission of antidumping duty administrative review) ("<u>Final Results</u>"), as amended by 77 Fed. Reg. 64,102 (Dep't Commerce Oct. 18, 2012) (amended final results and partial final rescission of antidumping duty administrative review) and accompanying Issues & Decision Mem., A-552-802, ARP 10-11 (Sept. 4, 2012) ("<u>I & D Mem.</u>").

[3] AHSTAC is an association of manufacturers, producers, and wholesalers of a domestic like product in the United States that participated in this review. Compl., ECF No. 2, at ¶ 7.

[4] <u>See</u> Mot. of [AHSTAC] for J. on the Agency R. Under USCIT Rule 56.2, Ct. No. 12-00310, ECF No. 35 ("AHSTAC's Br.").

contends that 1) Commerce unreasonably based its valuation of respondents' factors of production on surrogate market-economy data from Bangladesh, rather than the Philippines[5]; and 2) Commerce unreasonably valued the relevant labor wage rates using data from a single surrogate market economy.

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[6] and 28 U.S.C. § 1581(c) (2006).

As explained below, because Commerce's well-reasoned selection of Bangladesh as an appropriate market economy surrogate for Vietnam was supported by a reasonable reading of the record evidence, Commerce's reliance on data from Bangladesh to construct normal values in this review is affirmed. Additionally, because Commerce reasonably applied its lawful new policy when calculating surrogate labor rates in this proceeding, Commerce's labor rate valuation is also affirmed.

---

[5] Because Commerce treats Vietnam as a non-market economy country, the agency determines the home market or normal value of merchandise from Vietnam by using surrogate market economy data to calculate production costs and profit. See *infra* Section I.A of this opinion.

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

## STANDARD OF REVIEW

The court will sustain Commerce's antidumping determinations if they are supported by substantial evidence and otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (defining "substantial evidence")), and the substantial evidence standard of review can be roughly translated to mean "is the determination unreasonable?" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation and alteration marks and citation omitted).

## DISCUSSION

I.  Surrogate Country Selection

First, AHSTAC claims that Commerce's determination to estimate respondents' market-value cost of producing the subject merchandise by relying on data from Bangladesh, rather than the Philippines, is unreasonable. AHSTAC's Br. at 9, 13-18.

*A. Background*

Because Commerce treats Vietnam as a non-market economy ("NME") country, the agency determines the normal value

of merchandise from Vietnam by using surrogate market economy
data to calculate production costs and profit. See 19 U.S.C.
§ 1677b(c)(1).  In doing so, Commerce's valuation of the factors
of production ("FOPs") must be "based on the best available
information regarding the values of such factors in a market
economy country or countries considered to be appropriate by the
[agency]." Id.  "[T]o the extent possible," Commerce is required
to use data from countries that are both economically comparable
to the NME and significant producers of comparable merchandise.
Id. at § 1677b(c)(4).

When choosing appropriate surrogate market economy
countries, Commerce first creates a list of potential surrogates
whose per capita gross national income ("GNI") falls within a
range of comparability to the GNI of the NME country (the
"potential surrogates list").[7]  Next, Commerce identifies which
countries on the potential surrogates list produce merchandise
comparable to the merchandise subject to the antidumping duty

---

[7] See Import Admin., U.S. Dep't Commerce, Non-Market Economy
Surrogate Country Selection Process, Policy Bulletin 04.1
(2004), available at http://ia.ita.doc.gov/policy/bull04-1.html
(last visited Apr. 30, 2014) ("Policy 4.1"). See also Fujian
Lianfu Forestry Co. v. United States, 33 CIT 1056, 1075-76,
638 F. Supp. 2d 1325, 1347-49 (2009) (discussing Commerce's
practice for creating the potential surrogates list and noting
that "[a]lthough Commerce places primary emphasis on GNI when
compiling its list of potential surrogate countries, it
apparently does not set a fixed range into which a potential
surrogate's per capita GNI must fall") (citation omitted).

order.[8]  After that, the agency determines "whether any of the countries which produce comparable merchandise are 'significant' producers of that comparable merchandise."[9]  Finally, "if more than one country has survived the selection process to this point, the country with the best [FOP] data is selected as the primary surrogate country."[10]

Because Commerce's policy is to treat all of the countries that were initially placed on the potential surrogates list as "equivalent in terms of economic comparability [to the NME country]," regardless of their relative GNI proximity thereto,[11] a literal application of <u>Policy 4.1</u> implies that Commerce will choose from among the potential surrogates that satisfy its selection criteria (i.e., economic comparability, significant production of comparable merchandise, and data availability) based solely on considerations of relative data

---

[8] <u>Policy 4.1</u>.  Commerce's policy provides detailed examples of the agency's process for determining whether merchandise that is not identical to the subject merchandise is nevertheless "comparable." <u>See</u> <u>id.</u>

[9] <u>Id.</u> (referring to 19 U.S.C. § 1677b(c)(4)).

[10] <u>Id.</u> (referring to 19 U.S.C. § 1677b(c)(1)).

[11] <u>Policy 4.1</u> (noting that this practice "reflects in large part the fact that the statute does not require [Commerce] to use a surrogate country that is at a level of economic development *most* comparable to the NME country") (emphasis in original).

quality.[12]  This means that even very slight differences in data

quality between the potential surrogates may become dispositive

and automatically outweigh comparatively large differences among

the candidates in terms of their economic comparability to the

NME country and the magnitude of their production of comparable

merchandise.[13]

    In prior opinions, this Court has remanded Commerce's

---

[12] See Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 882 F. Supp. 2d 1366, 1374 (2012) ("China Shrimp
AR5") (discussing "Commerce's policy of disregarding relative
GNI differences among potential surrogates for whom quality data
is available and who are significant producers of comparable
merchandise").

[13] In China Shrimp AR5, for example, both India and Thailand
satisfied all of the selection criteria to serve as potential
surrogate market economies for the People's Republic of China
("China"), which Commerce also treats as an NME country.
Although Thailand's GNI was nearly identical to China's, whereas
India's GNI was just over a third of China's, and although
Thailand was arguably a more significant producer of comparable
merchandise than India, Commerce selected India as the primary
surrogate country based on a very slight difference between the
relevant Indian and Thai FOP data.  Specifically, although the
Indian and Thai data were so similar in quality that Commerce
was unable to make a distinction between the two datasets based
on the agency's usual data-evaluation standards, Commerce found
that the Indian data for shrimp larvae (the critical input for
producing the subject merchandise) did not specify the species
of shrimp to which they referred, whereas the Thai data for
shrimp larvae were specific to a species of shrimp that the
mandatory respondent in that proceeding did not produce.  On the
basis of this distinction – i.e., based essentially on a finding
that a subset of the Indian data was more vague than its
counterpart within the Thai data – Commerce selected India as
the primary surrogate country for China. See China Shrimp AR5,
__ CIT at __, 882 F. Supp. 2d at 1372, 1375-76.

surrogate country selections where the agency applies Policy 4.1 in a way that arbitrarily discounts the value of relative GNI proximity (i.e., relative economic comparability) to the NME country when choosing among potential surrogates for whom quality data is available and who are significant producers of comparable merchandise. See China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1374-76; Amanda Foods (Vietnam) Ltd. v. United States, 33 CIT 1407, 1413, 647 F. Supp. 2d 1368, 1376 (2009) ("Vietnam Shrimp AR2").

    *B. Analysis*

        Here, AHSTAC challenges Commerce's selection of Bangladesh as the primary surrogate market economy country for Vietnam in this review. AHSTAC's Br. at 13-18.  Specifically, AHSTAC contends that Commerce erred by applying Policy 4.1 in such a way that "the GNI differential between Vietnam and the potential surrogate countries was completely excluded from consideration when Commerce selected Bangladesh [in this review]." Id. at 16.  Accordingly, AHSTAC argues that Commerce's surrogate country selection should be remanded on the same grounds as those supporting remand in China Shrimp AR5 and Vietnam Shrimp AR2. Id. at 16-18.

        But AHSTAC mischaracterizes the record in this case. Commerce has not "completely excluded from consideration" the

potential surrogates' relative GNI proximity to the GNI of
Vietnam when selecting the primary surrogate country from the
potential surrogates list.  On the contrary, Commerce explicitly
acknowledged that "India's [GNI[14]] is closer to that of Vietnam"
than "the relatively less similar [GNI] of the Philippines and
Bangladesh." I & D Mem. cmt. 1 at 4.[15]  Commerce then determined
that, on the record of this review, the accuracy-enhancing value
of Bangladesh's significantly superior FOP data quality
outweighed the accuracy-enhancing value of India's relative GNI
proximity. See id. at 5.[16]

---

[14] Although the Issues & Decision Memorandum refers to the
potential surrogates' gross domestic product ("GDP") rather than
their GNI, Commerce in fact generates the potential surrogates
list using GNI figures, rather than GDP. See Antidumping
Methodologies in Proceedings Involving Non-Market Economy
Countries: Surrogate Country Selection and Separate Rates,
72 Fed. Reg. 13,246, 13,246 n.2 (Dep't Commerce Mar. 21, 2007)
(noting that Commerce uses GNI, rather than GDP, to construct
the potential surrogates list because "while the two measures
are very similar, per capita GNI is reported across almost all
countries by an authoritative source (the World Bank), and
because [Commerce] believes that the per capita GNI represents
the single best measure of a country's level of total income and
thus level of economic development").

[15] Commerce determined that the Philippines, India, and
Bangladesh were each within the range of economic comparability
to Vietnam, and were each significant producers and exporters of
products comparable to the subject merchandise during the
relevant time period. I & D Mem. cmt. 1 at 4.

[16] Because Commerce in fact addressed "the GNI differential
between Vietnam and the potential surrogate countries," AHSTAC's
Br. at 16, in making its primary surrogate country selection,
declining to reach the merits of AHSTAC's contention that
                                                (footnote continued)

        Specifically, Commerce determined that the available

Philippine data on shrimp (the FOP accounting for the largest

portion of normal value) omitted "substantial portions of the

range of sizes of shrimp sold by the respondents," while the

available Indian data on shrimp was 1) limited to a sole company

within India, and thus did not "represent the broad market

average [that Commerce] prefers," and 2) provided values that

were publicly ranged, and thus values that did not "represent

actual, exact prices for shrimp in the Indian market." I & D

Mem. cmt. 1 at 5.  The available Bangladeshi data, on the other

hand, represented a broad-market average, were product-specific,

contemporaneous with the POR, and represented actual transaction

prices. Id.  Accordingly, Commerce determined that,

notwithstanding Bangladesh's lesser GNI proximity to Vietnam

_____

Commerce improperly failed to do so would not be appropriate in
this case. Cf. Def.'s Corrected Resp. in Opp'n to Pl.'s Mot. for
J. Upon the Agency R., ECF No. 41 ("Def.'s Br.") at 20-23
(arguing that the court should decline to reach the merits of
AHSTAC's contention in this regard because AHSTAC failed to make
this argument before the agency in the first instance);
28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall,
where appropriate, require the exhaustion of administrative
remedies.") (emphasis added); Blue Field (Sichuan) Food Indus.
Co. v. United States, __ CIT __, 949 F. Supp. 2d 1311, 1321
(2013) ("This court has discretion to determine when it will
require the exhaustion of administrative remedies.") (citing
28 U.S.C. § 2637(d)); Itochu Bldg. Prods. v. United States,
733 F.3d 1140, 1145 (Fed. Cir. 2013) (holding that requiring
exhaustion of administrative remedies is appropriate where doing
so "can protect administrative agency authority and promote
judicial efficiency") (citation omitted).

than that of the other two potential surrogates, "the superiority of the Bangladeshi surrogate value data compared to the Philippine and Indian surrogate value data" outweighed the benefits of using data from a country with a relatively closer GNI to that of Vietnam.[17] See id. at 4-5.

Thus Commerce specifically weighed the relative GNI proximity of each potential surrogate to Vietnam's GNI against the significant differences in the quality of the relevant surrogate value data available from each of these countries.

_____

[17] Importantly, Bangladesh's *relatively* less similar GNI to that of Vietnam (when compared with India's GNI) does not affect Commerce's determination that all three potential surrogate countries independently fell within the range of economic comparability to Vietnam, and therefore that data from all three countries would satisfy that threshold statutory requirement. See I & D Mem. cmt. 1 at 4.  The appropriateness of placing Bangladesh on the initial potential surrogates list (based on Commerce's finding that Bangladesh's GNI fell within the range of economic comparability to Vietnam) is uncontested. Accordingly, Fujian Lianfu – which addressed a challenge to the appropriateness of placing India on the potential surrogates list for China, and was therefore not concerned with the *relative* economic comparability of potential surrogates, but rather with whether India should have been considered a potential surrogate at all, 33 CIT at 1075, 638 F. Supp. 2d at 1347 – is inapposite to the case at hand. Cf. Def.'s Br. at 13 (relying on Fujian Lianfu to argue that "Commerce applied the standard that this Court affirmed in Fujian").  It may well be that, in placing Bangladesh on the potential surrogates list for Vietnam, Commerce applied the standard that the court affirmed in Fujian Lianfu, but Commerce's initial placement of Bangladesh on the potential surrogates list is not the issue before the court.  Here, the challenge is to Commerce's consideration of the merits of each of the potential surrogates on that list relative to each other, which is an issue that was not before the court in Fujian Lianfu.

See I & D Mem. cmt.1 at 4-5.  Accordingly, contrary to AHSTAC's contentions, Commerce did in fact consider the differences in GNI among the potential surrogates.  For this reason, the grounds supporting the remand orders in China Shrimp AR5 and Vietnam Shrimp AR2 are not present in this case.[18]

Moreover, Commerce's explanation for why the agency chose to give more weight to the superiority of the Bangladeshi surrogate value data than to India's relatively closer GNI is reasonable.[19]  Specifically, Commerce explained that, although India's GNI was closer to that of Vietnam's – implying a more accurate estimate for the FOP values that tend to be linearly

---

[18] Cf. China Shrimp AR5, __ CIT __, 882 F. Supp. 2d at 1375 (explaining that, in that case, "Commerce did not decide that the superiority of Indian data quality outweighed the superiority of Thailand's economic comparability to the NME," but rather "Commerce decided that it need not consider relative economic comparability, or weigh one country's strength in economic comparability against another's strength in data quality") (citation omitted); Vietnam Shrimp AR2, 33 CIT at 1413, 647 F. Supp. 2d at 1376 (explaining that, in that case, Commerce did not consider or explain "why the difference in economic similarity to Vietnam [among the potential surrogates] is outweighed by the differences in quality of data between Bangladesh and India").

[19] Notably, although AHSTAC argues that Commerce should have selected the Philippines rather than Bangladesh, see AHSTAC Br. at 9, the Philippines' GNI is actually less similar to that of Vietnam than is Bangladesh's. See id. at 7 (quoting record evidence listing the per capita GNIs for Vietnam, Bangladesh, and the Philippines as $1,010, $590, and $1,790, respectively; and thus showing that the GNI differential between Vietnam and Bangladesh ($1,010 - $590 = $420) is in fact nearly half that between Vietnam and the Philippines ($1,010 - $1,790 = -$780)).

correlated with GNI, such as wage rates[20] – the available Indian
surrogate value data for shrimp (the FOP accounting for the
largest portion of normal value) was limited to only a single
company and did not reflect exact market prices, whereas the
available Bangladeshi data represented a broad market average
based on actual transaction prices. I & D Mem. cmt. 1 at 5.[21]

Accordingly, because Commerce's selection of
Bangladesh as the primary surrogate country for Vietnam in this
review was supported by a reasoned and reasonable analysis of
the record, this determination is sustained as supported by
substantial evidence. See Nippon Steel, 458 F.3d at 1351.

## II. Labor Wage Rate Valuation

AHSTAC also argues that the Final Results should be
remanded for additional consideration because they "are devoid
of any effort to address Commerce's prior labor findings, let
alone explain why those findings are no longer persuasive."

---

[20] See infra Section II of this opinion.

[21] Again, these facts distinguish this case from China Shrimp AR5
and Vietnam Shrimp AR2, where Commerce did not consider the
potential surrogates' relative GNI proximity to the NME country
at all. See supra note 18.  Moreover, in China Shrimp AR5,
unlike here, the differences in data quality between the
potential surrogates were too minor to reasonably support a
conclusion that data superiority outweighed any potential
benefits from using data from a surrogate with a GNI that was
closer to that of the NME in question. See China Shrimp AR5,
__ CIT __, 882 F. Supp. 2d at 1375-76.

AHSTAC Br. at 25 (citation omitted).  Specifically, AHSTAC

faults Commerce for deciding to value the labor FOP in the same

way that the agency values all other surrogate FOPs (i.e., by

relying on data from a single surrogate country, unless reliable

data for a particular FOP are not available from the primary

surrogate), without explaining its departure from its prior

position that "labor is different." Id. (internal quotation

marks and citation omitted).

   *A. Background*

        In the past, Commerce generally valued the labor FOP

for merchandise from NME countries by using "regression-based

wage rates reflective of the observed relationship between wages

and national income in market economy countries." 19 C.F.R.

§ 351.408(c)(3) (2010).  Regression-based NME wage rates

estimated the linear relationship between GNI and wage rates to

arrive at the wage for an NME country by using the NME's GNI.[22]

---

[22] Zhejiang DunAn Hetian Metal Co. v. United States, __ CIT __,
707 F. Supp. 2d 1355, 1366 (2010) (footnote omitted), vacated on
other grounds, 652 F.3d 1333 (Fed. Cir. 2011); see also Dorbest
Ltd. v. United States, 604 F.3d 1363, 1371 (Fed. Cir. 2010)
("Commerce determines a linear trend that best fits the data,
providing a way to predict the labor rate for a country with any
given gross national income."); Antidumping Duties;
Countervailing Duties, 61 Fed. Reg. 7308, 7345 (Dep't Commerce
Feb. 27, 1996) ("[W]hile per capita [gross domestic product] and
wages are positively correlated, there is great variation in the
wage rates of the market economy countries that [Commerce]
typically treats as being economically comparable. As a
                                          (footnote continued)

During the fourth administrative review of this antidumping duty

order, however, 19 C.F.R. § 351.408(c)(3) was invalidated as

contrary to the statute because, rather than evaluating the

extent to which it was possible to base surrogate FOP

calculations on data from countries that are economically

comparable to the NME and significant producers of comparable

merchandise,[23] the regulation instead formulaically required

reliance on data from countries that did not satisfy one or both

of these statutory requirements.[24]

---

practical matter, this means that the result of an NME case can
vary widely depending on which of the economically comparable
countries is selected as the surrogate. . . . [U]se of
[regression-based] wage rate[s] will contribute to both the
fairness and the predictability of NME proceedings. By avoiding
the variability in results depending on which economically
comparable country happens to be selected as the surrogate, the
results are much fairer to all parties.").

[23] See 19 U.S.C. § 1677b(c)(4).

[24] See Dorbest, 604 F.3d 1371-72 (holding that because the
statute requires Commerce to use data from economically
comparable countries "to the extent possible," Commerce may not
employ a methodology that requires using data from both
economically comparable and economically dissimilar countries,
in the absence of a showing "that using the data Congress has
directed Commerce to use is impossible"); Shandong Rongxin Imp.
& Exp. Co. v. United States, __ CIT __, 774 F. Supp. 2d 1307,
1316 (2011) (holding that because the statute requires Commerce
to use, "to the extent possible," data from countries that are
"significant" producers of comparable merchandise, Commerce may
not employ a methodology that requires using data from
"countries which almost certainly have no domestic production –
at least not any meaningful production, capable of having
influence or effect").

Subsequently, before the results of the fifth review
of this antidumping duty order were finalized but after Commerce
had already made its preliminary surrogate country selection for
that review, Commerce published its New Labor Rate Policy,
explaining its change in policy for constructing surrogate labor
rates.[25]  Specifically, the New Labor Rate Policy rejected
Commerce's prior preference for using data from multiple market
economies to construct surrogate labor rates in favor of a
policy of relying on data from a single market economy to
calculate all surrogate FOPs, including labor. Id. at 36,094.
Because the results of the fifth review had not yet been
finalized at the time that the New Labor Rate Policy went into
effect, Commerce applied its new policy in that review, as it
has in all subsequent antidumping proceedings involving
merchandise from NME countries.

In adjudicating AHSTAC's challenge to Commerce's
application of its New Labor Rate Policy in the fifth review of
this antidumping duty order, this Court sustained the New Labor
Rate Policy as reasonable on its face, holding that "Commerce
reasonably determined that, in general, the administrative costs

---

[25] Antidumping Methodologies in Proceedings Involving Non-Market
Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg.
36,092 (Dep't Commerce, June 21, 2011) ("New Labor Rate
Policy").

of engaging in a complex and lengthy analysis of additional
surrogate data for the labor FOP may outweigh the accuracy-
enhancing benefits of doing so."[26]  But because Commerce had
initially selected the primary surrogate country in that segment
of this antidumping proceeding before the New Labor Rate Policy
went into effect, when Commerce's policy was still to use
multiple countries' data to calculate surrogate labor rates,
Commerce's initial surrogate country analysis did not consider
the reasonableness of its selection in terms of providing the
best available information regarding the surrogate values for
all FOPs, including labor.  And because Commerce did not
reevaluate the appropriateness of its surrogate country
selection for valuing all of the FOPs, including labor, when
applying its New Labor Rate Policy in finalizing the results of
that review, Commerce's surrogate country selection was remanded
for the agency to explicitly weigh the evidence that its chosen
surrogate's wage data were likely to understate the surrogate
market labor rate for the shrimping industry in Vietnam (given
the particular GNI disparity between the surrogate and the NME
country and the linear relationship between GNI and wage)

---

[26] Camau Frozen Seafood Processing Imp. Exp. Corp. v. United
States, __ CIT __, 968 F. Supp. 2d 1328, 1336 (2014) ("Vietnam
Shrimp AR5") (citing Camau Frozen Seafood Processing Imp. Exp.
Corp. v. United States, __ CIT __, 880 F. Supp. 2d 1348, 1358
(2012)).

against the remaining evidence that the chosen surrogate's FOP
data as a whole were nevertheless the best available data on
record from which to value all of the surrogate FOPs.[27]

   *B. Analysis*

        Here, unlike Vietnam Shrimp AR5, Commerce specifically
weighed the considerations that the court ultimately ordered
Commerce to weigh in the remand of that prior review. See I & D
Mem. cmt. 1 at 4-5.  Commerce explained that, although India's
GNI was closer to that of Vietnam's – implying a more accurate
estimate for the FOP values that tend to be very closely
correlated with GNI, such as wage rates[28] – the available Indian
surrogate value data for the FOP accounting for the largest
portion of normal value were so inferior to the available
Bangladeshi data that any accuracy-enhancing benefit accruing
from selecting India – the country with the closest GNI to
Vietnam's – was in fact outweighed by the accuracy-loss of
inferior data quality. See id.[29]  Thus, as already discussed,[30]

---

[27] Id. at 1336-37.

[28] See *supra* note 22.

[29] As discussed above, Commerce found that the Indian data was
limited to only a single company and did not reflect exact
market prices, whereas the available Bangladeshi data
represented a broad market average based on actual transaction
prices. I & D Mem. cmt. 1 at 5.

[30] See *supra* Section I of this opinion.

Commerce's primary surrogate country analysis in this review reasonably accounted for the effect of the specific GNI differential between Bangladesh and Vietnam (i.e., the likely underestimation of the surrogate labor rate) by explaining that any accuracy-loss from an underestimated wage rate is outweighed by the accuracy gained from using Bangladeshi data for the remaining FOPs. See I & D Mem. cmt. 1 at 4-5.

AHSTAC does not point to any specific record evidence to suggest that Commerce's analysis resulted in an unreasonable choice of surrogate FOP data as a whole – i.e., AHSTAC has not pointed to any evidence that Commerce has not already considered and weighed when making its primary surrogate country selection and implementing its new policy of sourcing all FOP data from that primary surrogate.[31]  And while AHSTAC is correct that, notwithstanding the New Labor Rate Policy, Commerce may not rely on data that are aberrational or distortive,[32] AHSTAC's argument

---

[31] Indeed, as already noted above, the GNI differential between Vietnam and the Philippines (AHSTAC's preferred surrogate) is *greater* than that between Vietnam and Bangladesh. See *supra* note 17. Cf. Vietnam Shrimp AR5, __ CIT at __, 968 F. Supp. 2d at 1336-37 (suggesting that a logical implication of Commerce's New Labor Rate Policy is that considerations of the labor-valuation accuracy-enhancing benefits of a potential surrogate's GNI proximity to the GNI of the NME country must now be weighed as part of Commerce's primary surrogate country selection analysis).

[32] The New Labor Rate Policy itself explicitly acknowledges this. See New Labor Rate Policy, 76 Fed. Reg. at 36,094 ("If there is
(footnote continued)

that the Bangladeshi wage data used in this review were aberrational is not persuasive.  As Commerce explained, see I & D Mem. cmt. 2C at 12, although the Banglandeshi labor data exhibit values lower than other countries on Commerce's initial potential surrogates list, this does not mean that the numbers are aberrational.  Rather, just as Bangladesh's GNI is the lowest within the range of GNI values exhibited by the countries on the potential surrogates list (all of which were determined to satisfy the threshold economic comparability requirement, a determination that is not contested), so too Bangladesh's labor data is merely the lowest value within the range of economically comparable countries on that list.  See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 929 F. Supp. 2d 1352, 1356 n.9 (2013) (rejecting a similar argument made by AHSTAC in a challenge to the final results of the fifth review of this antidumping duty order).

     Thus AHSTAC's challenge to Commerce's reliance on its New Labor Rate Policy to value all relevant FOPs in this review

_____

evidence submitted on the record by interested parties demonstrating that the NME respondent's cost of labor is overstated, the Department will make the appropriate adjustments to the surrogate financial statements subject to the available information on the record."); I & D Mem. cmt. 2C at 13 (noting that Commerce will look to data beyond that from the primary surrogate country "when a suitable [FOP] value from the primary surrogate country does not exist on the record").

(including the labor rate) using data from the primary surrogate
country must be rejected because Commerce's <u>New Labor Rate
Policy</u> is generally reasonable, and no evidence suggests that it
was unreasonably applied on the record of this review.

**CONCLUSION**

For all of the foregoing reasons, Commerce's <u>Final
Results</u> are sustained.   Judgment will issue accordingly.


                                    /s/ Donald C. Pogue
                             Donald C. Pogue, Chief Judge

Dated: May 29, 2014
       New York, NY